```
 1                     UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2

 3   UNITED STATES OF AMERICA,        )
                         Plaintiff,   )
 4                                    )
     vs.                              )  No. 20-CR-10111-RWZ-1
 5                                    )
     CHARLES LIEBER,                  )
 6                         Defendant. )

 7

 8

 9

10
                     BEFORE THE HONORABLE RYA W. ZOBEL
11                     UNITED STATES DISTRICT JUDGE
                           SENTENCING HEARING
12

13

14

15           John Joseph Moakley United States Courthouse
                             Courtroom 12
16                         One Courthouse Way
                       Boston, Massachusetts 02210
17

18                          April 26, 2023
                              9:25 a.m.
19

20

21
                    Kathleen Mullen Silva, RPR, CRR
22                      Official Court Reporter
             John Joseph Moakley United States Courthouse
23                  One Courthouse Way, Room 7209
                       Boston, Massachusetts 02210
24                  E-mail: kathysilva@verizon.net

25           Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2

 3          United States Attorney's Office

 4          Jason A. Casey, Esq.

 5          John Joseph Moakley U.S. Courthouse

 6          Boston, Massachusetts 02210

 7          617.748.3498

 8          for the Government

 9

10          Mukasey Frenchman & Sklaroff LLP

11          Marc L. Mukasey, Esq.

12          Kenneth A. Caruso, Esq.

13          Stephanie Guaba, Esq.

14          Torey K. Young, Esq.

15          2 Grand Central Tower

16          140 East 45th Street, 17th Floor

17          New York, New York 10017

18          212.466.6400

19          for the Defendant

20

21

22

23

24

25
```

```
  1                    P R O C E E D I N G S
  2            THE CLERK:  All rise.
  3            THE COURT:  Good morning.  Please be seated.
  4            THE CLERK:  This is the United States v. Charles
  5    Lieber.  It's Criminal 20-10111.
  6            Can I ask counsel to identify themselves for the
  7    record.
  8            MR. CASEY:  Good morning, Your Honor.  Jason Casey for
  9    the United States.
 10            THE COURT:  Wait a minute.  I have to find my docket
 11    sheet.
 12            All right.  For defense counsel we have?
 13            MR. MUKASEY:  Hi, Judge.  Marc Mukasey for the
 14    defendant, Charles Lieber.
 15            THE COURT:  Wait a minute.  We start with Mr. Mukasey?
 16            MR. MUKASEY:  Yes, ma'am.
 17            THE COURT:  I'm sorry.  Could you speak up, please.
 18            MR. MUKASEY:  Yeah, the defendant, Charles Lieber --
 19            THE COURT:  In fact, everybody who says something to
 20    the court, please do it sitting down and into the microphone.
 21            MR. MUKASEY:  It is nice to see you again, Judge.
 22    Marc Mukasey for the defendant, Charles Lieber.  With me is my
 23    co-counsel Ken Caruso and Ms. Torrey Young.
 24            THE COURT:  Wait a minute.  Mr. Lieber is here,
 25    correct --
```

```
 1              MR. MUKASEY:  He is.

 2              THE COURT:  -- at counsel table?

 3              And in addition to Mr. Mukasey, who is at the first

 4    counsel table?

 5              MR. MUKASEY:  Mr. Caruso.

 6              THE COURT:  I'm sorry?

 7              MR. MUKASEY:  Mr. Caruso, C-a-r-u-s-o.  Mr. Caruso.

 8              THE COURT:  And in the back, the second row?

 9              MR. MUKASEY:  In the back is our associate Ms. Guaba,

09:38 10    and to my left is Ms. Young.

11              THE COURT:  And there's another person in the back.

12              MR. MUKASEY:  That's our paralegal.

13              THE COURT:  Okay.

14              The defendant had filed a number of objections to the

15    presentence report.  I will note them all.  I don't see any

16    particular need to discuss them individually because they -- in

17    general, I find the presentence report okay.  I will accept any

18    objections to it.  But not -- I'm not ordering that the report

19    be changed in any way.  The objections are simply part of it.

09:39 20              MR. MUKASEY:  Understood, Judge.

21              THE COURT:  Okay.  Then I guess we should start with

22    the government's recommendation of sentence.

23              MR. CASEY:  Certainly, Your Honor.  The government is

24    recommending that the defendant be sentenced to 90 days in

25    prison.
```

1          THE COURT:  How much?

2          MR. CASEY:  90 days.

3          THE COURT:  90 days incarceration?

4          MR. CASEY:  Correct.  One year of supervised release

5    to include a condition of 90 days of home confinement.

6          THE COURT:  How many?

7          MR. CASEY:  90 days of home confinement.  A fine of

8    $150,000 and restitution to the IRS of $33,600.

9          THE COURT:  That has already been paid?

09:40 10          MR. CASEY:  It's already been paid but simply ask the

11   court to enter an order to that effect.

12          THE COURT:  So the fine you say is how much?

13          MR. CASEY:  $150,000, Your Honor.

14          THE COURT:  That wasn't in your brief.

15          MR. CASEY:  I believe it was, Your Honor.  Let me

16   double-check.

17          On page 2 in the middle of the page, Your Honor, we

18   specify the $150,000 fine.

19          THE COURT:  Oh, true, it's here.  Okay.

09:40 20          So your memorandum asked for 90 days home confinement,

21   which is what you just mentioned as well.

22          MR. CASEY:  Correct.  90 days of home confinement in

23   addition to the 90 days incarceration that we're seeking.

24          THE COURT:  I'm sorry?

25          MR. CASEY:  In addition to the 90 days of

1    incarceration that we're also seeking.

2            THE COURT:  90 days in prison, one year supervised

3    release, including 90 days of home confinement and $150,000

4    fine, as well as restitution, which I gather has already been

5    paid.

6            MR. CASEY:  That's correct, Your Honor.

7            THE COURT:  So I will hear -- I guess I should hear

8    the defendant's recommendation, and then we will go back to the

9    government to argue its case.

09:41 10            MR. MUKASEY:  Our recommendation, Judge, is for a

11    non-custodial sentence, a sentence of --

12            THE COURT:  I'm sorry, how much?

13            MR. MUKASEY:  It is for a non-custodial sentence.  No

14    jail time.  Our recommendation is for a sentence of probation,

15    a sentence that may be satisfied by a term of home confinement.

16            THE COURT:  Probation for what period of time?

17            MR. MUKASEY:  One year.

18            THE COURT:  I'm sorry?

19            MR. MUKASEY:  One year.

09:42 20            THE COURT:  Are there any special conditions for this

21    probation?

22            MR. MUKASEY:  If Your Honor --

23            THE COURT:  I mean, other than the usual?

24            MR. MUKASEY:  If your Honor believes it's necessary,

25    we think home confinement during the period of probation would

1    be something you could consider.  But we think straight

2    probation for various reasons, which I can get into in my

3    argument.

4         We also note that -- I think the fine is excessive.  I

5    think any term of imprisonment is excessive and can be

6    satisfied with home confinement.  And that we paid the

7    restitution.

8         THE COURT:  How much home confinement?  For the whole

9    period of time, the whole year?

09:42 10         MR. MUKASEY:  I think a period of home confinement of

11    a year would be satisfactory.  And more than necessary -- more

12    than enough.

13         THE COURT:  So you're suggesting a sentence of

14    straight probation for one year, which also includes one year

15    of home confinement.

16         MR. MUKASEY:  That's one option, Judge.  I think six

17    months of home confinement is probably a more just and fair and

18    compassionate sentence.

19         THE COURT:  So what are you asking for?

09:43 20         MR. MUKASEY:  I'm asking for a sentence of probation.

21    Whether you get there by going down on the guidelines or you

22    get there through 3553, we believe a sentence of probation, no

23    incarceration, is appropriate.

24         THE COURT:  I understand that part.  But the

25    conditions, in addition to -- or the conditions in conjunction

```
 1   with the supervised release -- you want one year supervised
 2   release and probation for the entire time of that one year
 3   supervised release.
 4           MR. MUKASEY:  If there needs to be --
 5           THE COURT:  Not probation, home confinement.
 6           MR. MUKASEY:  If there needs to be a period of home
 7   confinement, we would accept that.
 8           THE COURT:  Home confinement for the whole year?
 9           MR. MUKASEY:  We would ask for six months.  We would
10   accept a full year.
11           THE COURT:  And what about the fine?
12           MR. MUKASEY:  We think the fine is Draconian, and we
13   think --
14           THE COURT:  So no fine?
15           MR. MUKASEY:  We ask for no fine.  And of course, as
16   Your Honor mentioned, $33,600 in restitution has already been
17   paid.
18           THE COURT:  So the financial consequences of this with
19   respect to the criminal case are essentially zero because the
20   repayment was something that he owed, but it's not a fine of
21   any kind.
22           MR. MUKASEY:  I would argue that the financial
23   consequences have hit Professor Lieber in many, many ways that
24   do not need to be exacerbated through a fine.  He's lost
25   income.  He's lost his job.  He spent money defending this
```

09:44 10

09:44 20

1     case.  And he spends money on his health to try to keep himself

2     alive.  I think a fine is excessive and does not mean that he

3     walks away from this with no financial consequences.

4            THE COURT:  Okay.  I'll hear the government's

5     recommendation and justification therefor.

6            MR. CASEY:  Your Honor, I'm happy to state the

7     recommendation again unless Your Honor --

8            THE COURT:  By the way, I'm sorry, before you start.

9            The probation report is its usual complete and good

09:45 10     self.  I know that particularly the defendant had a number of

11     objections.  They're all noted.  I'm not changing the probation

12     officer's report.  But I am attaching all of the objections

13     that the defendant has made.  I don't think the plaintiff made

14     any.

15            MR. CASEY:  Your Honor, we didn't make any objections

16     as such, although -- and this is my fault -- I did not notice

17     what the government perceives as a grouping error.  The way the

18     probation report groups the counts of conviction we disagreed

19     with and lodged a later objection and we note that in our

09:46 20     sentencing memorandum.

21            THE COURT:  Excuse me one moment.  Mr. Marshal, can I

22     talk to you for one moment.

23            (Discussion held off the record.)

24            THE COURT:  I asked the marshal not to allow people to

25     stand in the courtroom.  Wandering in and out is very

1    destructive of any sort of way of keeping going.

2         All right.  Mr. --

3         MR. CASEY:  To answer your question, Your Honor, we

4    did not lodge a formal objection to the way the counts are

5    grouped but we do object --

6         THE COURT:  Let me ask you one favor of you.  Please

7    sit down and talk into the microphone and then everybody can

8    hear you.

9         MR. CASEY:  Of course.

09:47 10         THE COURT:  Thank you.

11         MR. CASEY:  So we did not lodge any formal objections,

12    Your Honor, but we did note in our sentencing memorandum and in

13    an email, a late email --

14         THE COURT:  They're part of the record as well.

15         MR. CASEY:  Thank you.

16         Your Honor, would you like me to proceed with my

17    justification for the sentence that we're recommending?

18         THE COURT:  Do you wish to be heard any further on

19    this?

09:47 20         MR. CASEY:  Not regarding objections.  But we would

21    like to explain to the court why we're --

22         THE COURT:  With respect to your recommendation?

23         MR. CASEY:  That's correct.  So Your Honor, I think

24    what stands out most to the government about this case and

25    about this defendant is how, on the one hand, given his

1    extraordinary intellect, his extraordinary education, he had an
2    ability more so than most defendants to appreciate the
3    wrongfulness of his conduct.

4         And yet, on the other hand, the number of times that
5    he deliberately chose to lie not only to the university that
6    employed him, but the agencies that funded his research.  These
7    crimes were not the product of a rash decision.  They were not
8    the product of a temporary lapse in judgment.  The crimes
9    literally span seven years, possibly even more, and it's
09:48 10    remarkable the number of times during that seven years that the
11    defendant had the opportunity to come clean about his
12    relationship with Wuhan University and the Thousand Talents
13    Program and yet each and every time, despite his intellect,
14    despite his ability to appreciate the wrongfulness of his
15    conduct, despite the trust that had been placed in him by
16    Harvard University and by the agencies that sponsored his
17    research, he deliberately chose to lie over and over and over
18    again despite being given every possible opportunity to come
19    clean about what he had done.

09:49 20         I think the most striking example of this, Your Honor,
21    is the most recent one, from December of 2018, when the
22    National Institutes of Health reached out to Harvard and they
23    asked for some information about the defendant's then suspected
24    ties to Wuhan University and the Thousand Talents Program.  I
25    would submit, Your Honor, that Harvard really treated the

1    defendant with kid gloves in response to that inquiry.  They

2    very politely and very reasonably reached out to him via email

3    and set up an interview days in advance.

4         And then they actually did something quite

5    extraordinary.  They actually shared their interview questions

6    with him.  They told him exactly what they were going to ask

7    him during the interview, including are you now or have you

8    ever been a member of the Thousand Talents Program.  And then

9    after they interviewed the defendant, they compiled his answers

09:50 10    into a written submission to NIH and they shared it with him

11    and they asked him to make comments and suggestions and edits.

12    They expected that he would tell the truth.  They trusted him

13    to tell the truth.  And they had absolutely no reason to expect

14    that he would lie.  And the defendant abused that trust by not

15    only purposely lying during that interview but allowing Harvard

16    to unwittingly pass along the defendant's false information to

17    NIH in response to that inquiry.

18         These crimes and the other crimes that he's been

19    convicted of now are not abhorrent conduct.  I think, given the

09:50 20    time period over which they occurred, I think it's fair to say

21    that this conduct reflects who the defendant was.  He was

22    somebody who was willing to lie and to deceive in order to

23    protect the thing that mattered to him most, and that was his

24    career.

25         And so now having lied to Harvard and the agencies

that funded his research and abused that trust, he is now

essentially arguing that because he has lost his job and his

lab and the privilege -- the privilege of conducting taxpayer-

funded research, that he's been punished enough, that he

doesn't need to be punished anymore, including by serving a

period of incarceration.  And the government does not mean to

suggest that those sorts of collateral consequences can never

have an impact on sentencing or should not be considered at

sentencing.  They very clearly can in certain circumstances.

But in the circumstances of this case, given this defendant's

conduct, we would urge the court not to give them any

meaningful weight for three reasons.

        The first is that the defendant was only in a position

to commit these crimes because he was placed in a position of

trust by Harvard and by the agencies that sponsored his

research.  It is a privilege to be able to conduct taxpayer-

funded research.  It is not a right.  It is a privilege to hold

the title of university professor at Harvard.  It is not a

right.  And with those privileges came the trust from those

entities that he would be forthright and honest in his dealings

with them.  And having abused those privileges and that trust

by lying to Harvard and lying to his funding agencies over and

over again, it's hardly unexpected that those entities would

revoke those privileges that they had extended to the

defendant.  And the defendant should not be able to benefit

1    because of that.

2            What the defendant is asking the court to do is akin

3    to this:  If a medical doctor abuses his medical license by

4    committing health care fraud and then asks the court to show

5    him leniency because his medical license has been suspended,

6    well, that doesn't really make a whole lot of sense.  The

7    defendant can't blatantly abuse the privileges that were

8    extended to him by lying and then ask for leniency because

9    those privileges have rightfully been revoked or suspended.  If

09:53 10    anything, Your Honor, the fact that the defendant was in a

11    position of trust and abused that position makes him more

12    culpable than most defendants, not less culpable.  It makes him

13    more worthy of a significant sentence, not less significant.

14    To be clear, we are not seeking an abuse of trust enhancement

15    under the guidelines although, frankly, I think we would have

16    been justified in doing that.  But the fact remains that the

17    defendant abused the trust of Harvard and of the agencies that

18    sponsored his research in a very real and a very tangible way

19    and he should not be able to benefit because of that.

09:53 20            The second part of this, Your Honor, is that as I read

21    this portion of the defendant's sentencing memorandum and other

22    portions as well, I can't help but feel like the defendant is

23    inviting the court to treat him differently because he was a

24    prominent person who had a prominent career at a prominent

25    university.  As the court knows full well, it can't be that the

professor at Harvard is treated differently than the janitor at
Harvard because one of them has a more prominent career and
more to lose, quote/unquote, than the other.  So, for that
reason, Your Honor, I would submit that these collateral
consequences and the defendant's prominent position at Harvard
and the fact that he has suffered this reputational damage by
virtue of his own conduct warrants little consideration in
terms of what constitutes just punishment for this defendant.

The last thing I'll say about this really I think is
to put the defendant's claims about the loss of his job at
Harvard into their proper context, because the defendant makes
it sound like Harvard University cut ties with him on the day
of his arrest and wanted nothing to do with him after that.
And that is just simply not the case.

The fact of the matter is that, due largely to the
conditions that were imposed on him at the time of his arrest,
Harvard placed the defendant on paid administrative leave
shortly after his arrest, which means that for the large
duration of this case, the better part of two and a half years,
he has been paid his full salary by Harvard University.  And
then after his convictions in this case, after a jury of his
peers found that he committed six felonies, Harvard University
allowed him to retire with essentially all of his benefits
intact.

Now, I understand that the defendant would much rather

1    at this point in time be a professor at Harvard University.  I

2    don't doubt that for a second.  But the fact --

3            THE COURT:  Does that mean that he continues to get

4    retirement payments now or gets retirement payments as opposed

5    to earnings?

6            MR. CASEY:  I think the defense can speak to exactly

7    what his retirement benefits package entails but my

8    understanding is that he was allowed to retire with nearly all

9    of his retirement benefits intact.

09:56 10           So what I would submit, Your Honor, is that, given his

11   conduct in the case and the fact that he deceived Harvard over

12   the better part of a decade about many, many important things,

13   the fact that he was allowed to retire with benefits is

14   actually fairly extraordinary and I think it warrants important

15   consideration by the court.

16           Another thing that warrants consideration by the court

17   is the defendant's health.  In fact, the defendant's diagnosis

18   is a significant reason why the government is recommending a

19   sentence that is significantly below the low end of the

09:56 20   guidelines in this case.  The available information about his

21   health is contained in a letter that's attached to his

22   sentencing memorandum as Exhibit A.  It's a one-and-a-half-page

23   letter from his doctor dated January of this year.  To

24   summarize the letter -- and if I get any of this wrong, I

25   apologize, that's not my intent.  I'm happy to be corrected.

1    But to summarize the letter, essentially it says this:  The

2    defendant was diagnosed with an incurrable slow-growing form of

3    cancer approximately nine years ago.  He last received

4    treatment for that cancer in October of 2022.  Since that

5    treatment and as a result of that treatment his cancer is now,

6    thankfully, in remission.  As such, he's not currently

7    receiving any inpatient or outpatient treatment on a regular

8    basis, other than quarterly screenings.  He's not taking any

9    prescription medications.  However, he is considered to be

09:57 10    immunocompromised because of his treatment.  And so his doctor,

11    according to page 2 of the letter that the doctor submitted,

12    has advised him to take restrictions that we are all,

13    unfortunately, well accustomed to at this point in time given

14    the events of the last three years, which is that he's to wear

15    a mask indoors and avoid large indoor crowds, particularly in

16    poorly ventilated areas.

17         So given all of that, Your Honor, and without

18    downplaying the significance of the defendant's diagnosis, the

19    notion that the Bureau of Prisons cannot provide adequate care

09:58 20    to the defendant I think is unfounded.  We don't deny or doubt

21    the fact that in the past he has required extensive medical

22    treatment.  There is certainly a suggestion that at some point

23    in the future -- nobody can say when -- he may require more

24    medical care.  But the fact of the matter is right now, given

25    that his cancer is in remission, he does not appear to require

1    extensive medical care.  In fact, according to his memo, he has

2    spent most of his time over the past several months at home,

3    not in doctor's offices or in hospitals, which means, Your

4    Honor, that a BOP facility can provide care to this defendant

5    right now and for the foreseeable future, which I think leaves

6    the question, Your Honor, of whether, given his

7    immunocompromised condition, the defendant can be safely

8    incarcerated for a period of 90 days or whether incarceration

9    creates an unjustifiable risk to his health.

09:58 10            Again, respecting the defendant's diagnosis and not

11    downplaying it by any means, I think the answer to that

12    question is yes, in large part because we are no longer in the

13    same place with respect to COVID-19 that we were a year ago or

14    even six months ago or even since January, when Dr. Lieber's

15    doctor wrote the letter that we see in Exhibit A.  The national

16    COVID-19 health energy is set to expire in about two weeks.

17    Most states are going to be allowing their local statewide

18    COVID-19 emergencies to expire at the same time.  That includes

19    Massachusetts.

09:59 20            Most -- I think positive COVID-19 cases amongst

21    federal inmates are at their lowest since before the pandemic.

22    The very detailed statistics that the Bureau of Prisons

23    maintains, which I checked this morning, reflect the fact that

24    most BOP facilities nationwide have zero COVID-19 positive

25    inmates.

1         So in light of all that, Your Honor, I don't think it

2    can be said that incarcerating this defendant for a period of

3    90 days is going to have a significant adverse health

4    consequence.  The fact of the matter is, sick and medically

5    compromised and immunocompromised defendants are sentenced to

6    prison every day.

7         THE COURT:  I'm sorry, your recommendation is 90 years

8    confinement in a prison?

9         MR. CASEY:  Ninety days confinement in a prison,

10:00 10  correct.

11        THE COURT:  Ninety days, rather.  And a period of

12   supervised release of one year?

13        MR. CASEY:  Correct.

14        THE COURT:  With 90 days home confinement at the

15   beginning presumably?

16        MR. CASEY:  Correct.

17        THE COURT:  And a fine of how much?

18        MR. CASEY:  $150,000.

19        THE COURT:  Okay.

10:00 20        MR. CASEY:  Part of our rationale for recommending 90

21   days is --

22        THE COURT:  I'm sorry.  The fine is in addition to

23   what he has already paid or does it encompass what he's already

24   paid as a fine?

25        MR. CASEY:  It's in addition to, Your Honor.

1                 THE COURT:  I'm sorry?

2                 MR. CASEY:  In addition to what he's already paid.

3                 THE COURT:  So it's included --

4                 MR. CASEY:  No.

5                 THE COURT:  So it's in addition to what he's already

6       paid?

7                 MR. CASEY:  Correct.  We're essentially asking he pay

8       $183,600.

9                 But in terms of the 90-day recommendation, part of the

10:01 10      rationale for that is that sentence can be structured around

11      the defendant's medical treatment.  In other words, we are

12      absolutely amenable to a report date that is after his next

13      cancer screening to ensure that his health is continuing to

14      trend in the right direction.  If the court orders him

15      incarcerated for 90 days, he would do that and then he would be

16      out in time for his next screening.  We think that represents

17      an eminently reasonable sentencing recommendation in this case

18      considering not just his health and his diagnosis, which is

19      significant and worthy of consideration, but all of the other

10:01 20      facts and circumstances of this case.

21                And so just, if I could summarize briefly, Your Honor,

22      the defendant's crimes are very serious.  They reflect a

23      profound lack of respect for the law over a considerable period

24      of time, nearly seven years, as I said, by, quite frankly,

25      somebody who knew better.

1          And so a sentence of incarceration in this case, Your

2    Honor, is necessary to punish the defendant.  It's necessary to

3    provide, or promote, rather, respect for the law and it's also

4    necessary to provide for general deterrence.

5          Lying to federal agents and obstructing legitimate

6    administrative inquiries and cheating on your taxes are not

7    unique to academia or professors at Harvard or people who

8    conduct government-sponsored research.  These are crimes that

9    are committed by people in all walks of life.  And they're also

10:02 10   crimes that are ripe for general deterrence.  In other words,

11   these are not crime of passion crimes, for lack of a better

12   word.  These are deliberate crimes that people generally have

13   to think about and consider before they commit them.  So they

14   were absolutely deterrable crimes.

15          I would submit, Your Honor, that most of the people

16   that commit these types of crimes are people like the

17   defendant.  They're people who have had little or no exposure

18   to the criminal justice system.

19          And so the prospect of serving 90 days in prison for

10:03 20   that category, that type of defendant, is significant.  A

21   significant sentence, even if it's 90 days, is absolutely

22   necessary, Your Honor, to send the appropriate deterrence

23   message.  A sentence of probation sends the opposite message,

24   that if you're a prominent professor and you have a prominent

25   career and you lie and you cheat and you deceive, including

1      cheating on your taxes over a period of years, you're going to

2      get a slap on the wrist.

3              So we would ask, Your Honor, for that reason and all

4      of the reasons we've stated in our sentencing memo and here in

5      court today that the court adopt our recommendations.  Thank

6      you.

7              THE COURT:  Thank you.

8              MR. MUKASEY:  Thank you, Judge.  I hope you'll indulge

9      me because I have a lot to say about Professor Lieber.  The

10:03 10    first thing that I will say, however --

11             THE COURT:  Are you asking for straight probation for

12     a one-year period?

13             MR. MUKASEY:  Yes.

14             THE COURT:  No home confinement, or that you had a

15     six-month home confinement suggestion.

16             MR. MUKASEY:  If you feel the need, a six-month home

17     confinement would be acceptable to us.

18             THE COURT:  Well, it's not my need.

19             MR. MUKASEY:  If you will the inclination, I think six

10:04 20    months of home confinement would be --

21             THE COURT:  And you propose no fine, no additional

22     fine?

23             MR. MUKASEY:  Correct.  There was a voluntary --

24             THE COURT:  He has paid restitution, 30-some-odd

25     thousand dollars, and nothing else.

1          MR. MUKASEY:  Voluntarily at a sentencing he did that.

2          THE COURT:  Okay.

3          MR. MUKASEY:  Judge, I hope, as I said, you'll indulge

4    me because I think the case the government just laid out

5    against Professor Lieber is callous.  It's misleading.  It's

6    naive.  And, frankly, it's dangerous to his health.  And I'm

7    going to touch on all those things, if you'll give me a couple

8    of minutes.

9          The first thing I want to say, Judge, is that when

10   this case came down back in January of 2020, there was a lot of

11   misunderstanding and misapprehension about what this case was

12   about.  Was it about espionage and stealing secrets and going

13   to China with them?  Was it about national security and

14   compromising intelligence?  The answer is it was about none of

15   those things.  Professor Lieber is a patriotic and loyal

16   American.  So we can put all the China stuff that's in the

17   government's papers to the side.

18         Professor Lieber, with respect to his work at Harvard,

19   was not charged with false statements related to grant fraud,

20   was not charged with offenses related to grant fraud.  The

21   validity of the grants that he was given by NIH and DOD are not

22   in dispute in this case.

23         And since Mr. Casey spoke about Professor Lieber's

24   work at Harvard and his supposed betrayal of Harvard, let me

25   say this:  When this investigation started and Harvard knew

1    full well that federal investigators were going to be asking

2    questions, Harvard got itself a fancy lawyer, a fancy law firm.

3    They did not document anywhere that we've seen that they

4    advised Professor Lieber that he should get a lawyer.  In other

5    cases that are similar, the university provided a lawyer.  That

6    did not happen here.

7          And while I'm on the subject of Harvard, allow me to

8    say this:  Harvard and also NIH, the National Institutes of

9    Health, to this day, if you go on their website, they are still

10:07 10    promoting and touting Professor Lieber's achievements, his

11    papers, his awards.  He's on their websites.  So Mr. Casey may

12    say that he somehow disrespected or deceived Harvard.  Harvard

13    deceived him.  Harvard failed to tell him to get a lawyer when

14    this whole thing started.  And Harvard is still taking

15    advantage of the research that he did.

16          Now, with respect to the seriousness of the conduct

17    here, that's an important factor obviously that the court has

18    to consider.

19          And let me say at the outset that Professor Lieber

10:08 20    made some bad judgments and he takes responsibility for those

21    judgments.  But it was never on the scale of what you just

22    heard from Mr. Casey or what's in the government's papers.

23          The government called his behavior chronic and

24    sustained.  Do you want to know what happened, Judge, and what

25    was proven here?  The indictment laid out charges that

1  stretched from 2013 to 2019.  But in that whole time period,

2  six years, Professor Lieber went to Wuhan, China three times.

3  Three times.  He spent about 72 hours in the entire period of

4  the indictment there.  He spent more time in an airplane

5  getting to China than he actually did in China.  And just to

6  illustrate how insignificant these issues, this Talent program

7  and Wuhan University was, we've calculated that during the time

8  of the indictment Professor Lieber spent probably about 23,000

9  hours in his lab.  He spent 76 hours in China.  That is less

10:09 10  than one percent of his time.

11          Now let me get to the point that Mr. Casey made today

12  and made in his papers that Professor Lieber was a greedy man

13  who was chasing fame and a slave to his career and trying to

14  line his own pockets because he was an entitled individual.

15  Respectfully, Your Honor, that is a crock of nonsense.  It's

16  misguided.  It's false.  It's fictional.

17          Charlie Lieber was never chasing money or fame.  He

18  lives a modest lifestyle.  When he wants to relax, he doesn't

19  go to a beach house or sail a yacht or race a car or go to

10:10 20  Vegas and gamble.  You know what he does?  He grows pumpkins.

21  He grows pumpkins and he feeds goats.  That's who he is.  The

22  only time most people have ever seen him wear a business suit

23  is in this courtroom because in the lab he wears lab clothing,

24  a lab coat and a sweatshirt.  Whatever money he got,

25  legitimately or illegitimately, most of it went to philanthropy

and caring for his children.  He lives in a house that is less

than modest.  But what he did with money that he earned, he

gave it to the American Cancer Society, to the Greater Boston

Food Bank.

THE COURT:  Excuse me.  Where in the record do I find

this information?

MR. MUKASEY:  It's in the tax returns.

THE COURT:  I'm sorry?

MR. MUKASEY:  It's in the tax returns.

10:11  THE COURT:  They're accurate in that respect?

MR. MUKASEY:  There's been no challenge that they were

inaccurate in any respect related to philanthropy.

When he got arrested, Judge, he had 8 bucks, $8 in his

pocket.  He is not a greedy cartoon villain that the government

talks about.  But you don't need to take my word for this.

You've got 150 letters from people who know him better than me

and certainly better than the government.

I'm going to quote from a couple of those letters.

And I picked these because they speak directly to refuting the

10:12  government's notion that he's a greedy, entitled human being.

Here's the first quote:  "He dedicated himself to finding the

truth in science, developing the technologies that can benefit

mankind and educating the next generation of scientists.  He

hardly cared about wealth, fame or comfort in life."

Let me give you another quote.  "He worked tirelessly,

1    not for his benefit, but for the benefit of his colleagues and

2    the whole community of Harvard and beyond.  He dropped popular

3    research areas that got him fame and decided to focus on a

4    direction not popular but that he was passionate about.  Since

5    that day, Dr. Lieber to me" -- this is from a student -- "since

6    that day, Dr. Lieber to me has been a definition of true

7    scientist, who is not fooled by fame and status."

8         A Nobel Prize winner wrote about Dr. Lieber:  "He's

9    dedicated to making fundamental discoveries that benefit

10   mankind.  He's a man of great integrity."  And here's the last,

11   and maybe the best, that refutes this argument that he's a

12   greedy bastard.  "I do not believe," says his student "that he

13   was ever motivated by personal gain.  On the contrary, he went

14   to great lengths to help anyone who shared his excitement about

15   the exploration of new directions in fundamental scientific

16   research."

17        The seriousness of the conduct that the government

18   attempts to portray rings hollow.  Yes, he admits the mistakes

19   that he made.  Yes, he accepts responsibility.  But he is not

20   the greedy villain that the government talks about.

21        I want to say something else about Mr. Casey's focus

22   on lies.  What drives the Sentencing Guidelines in this case is

23   not the false statement counts.  What drives the Sentencing

24   Guidelines in this case is the tax loss, $33,600, which

25   Professor Lieber's already paid.

1          Now, at that range, which the PSR calculates as a 12,

2    defendants in tax cases in this district, at least one of whom

3    was before you, Judge, have gotten probationary sentences, 12

4    to 18 months.  By the way, we contend that the guidelines range

5    should be 10 to 16 months for reasons that are in our memo, but

6    I don't want to divert there at the moment.

7          Tax crimes in this district with the same guidelines

8    range as in the PSR, 12 to 18 months, typically -- I shouldn't

9    say "typically" -- but I would say often get probation, perhaps

10:15 10   with some home confinement.  Actually, it gets better because

11   tax cases with higher guidelines ranges, all of which are

12   documented in our memo, also get non-incarceratory or

13   probationary sentences.  Let me just say that again.  People at

14   the same guidelines range for tax cases get probationary

15   sentences.  People with higher guidelines ranges in this

16   district often get probationary sentences.

17          Your Honor, and I know every case is different and I

18   don't want to hold Your Honor obviously to a prior ruling, but

19   Your Honor had a case with a fellow named Spinola, United

10:16 20   States v. Spinola, his guideline range was double.  His

21   guideline range was double what Professor Lieber's was.

22          (Discussion held off the record.)

23          THE COURT:  I managed to shut down the machine that

24   helps me to hear what's going on.

25          MR. MUKASEY:  If I need to speak more --

1          THE COURT:  Actually, it's the reporter's --

2          Go ahead.  I'm sorry.

3          MR. MUKASEY:  I was speaking about this man Spinola,

4     who appeared before Your Honor in 2020.  Spinola's sentencing

5     guideline range was 24 to 30 months, basically twice as high as

6     Professor Lieber's.  The amount of money that led to his

7     guidelines range that he caused the loss of was $344,000.

8          He prepared fake tax returns for other people, for his

9     clients.  These are far more egregious circumstances, and Your

10:18 10     Honor gave Mr. Spinola a probationary sentence.  Greater

11     guidelines, more money, Your Honor gave him a probationary

12     sentence.

13          There are other more egregious cases.  I'm going to

14     spare Your Honor my recitation of them.  They're in our memo.

15          I want to speak now to the medical condition.  Your

16     Honor, as you know from the papers, we're seeking a downward

17     departure from the guidelines range under Section 5H1.4 of the

18     guidelines, which allows for downward departures in the cases

19     of extraordinary physical impairment, in the case of a

10:18 20     seriously infirm defendant, and asks the court to consider

21     whether home detention may be a better outcome.

22          THE COURT:  Home detention for how long?

23          MR. MUKASEY:  I would leave that to the court, but I

24     think six months is plenty of time.  And let me tell you why.

25     This defendant, Professor Lieber, he's been living in a prison.

He's been living in a prison for probably ten years, but really the last three or four years. But he's been living in a prison because of his medical condition. And I'm going to explain what I mean by that. He's been living in a prison in his house that he can control. He can control the environment and I'm going to tell you what they do to control that environment.

He can reduce the severe threats to his immune system being home confined, being confined to his house. If you put him in a prison, he can no longer control what he needs to control to stay alive. Let me unpack that a little bit.

The government's characterization of Mr. Lieber as being in remission is simplistic, naive and I think dangerous. They sort of sound like he had a bad cold, he got over it and now he's free to go out and play with his friends. And that's not the situation that he's in.

Let me set the record straight about what is going on in his body. In 2013, ten years ago, Professor Lieber was diagnosed with follicular lymphoma. That's a cancer. It's a lymphoma of the white blood cells. That's cancer in his immune system. It's not curable. He has lived for ten years. But he has lived in constant pain. Every time the cancer comes back within that ten years and he needs another form of treatment, and he's had all sorts of different treatments, radiation, chemotherapy, immunotherapy and stem cell therapy called CAR T therapy, it's a blessing and a curse. It halts the cancer

1    temporarily and it destroys his body's immune system in the

2    process.  So yes, he is in remission today.

3         Let me tell you what a day in the life of remission

4    means for Charlie Lieber.  He lives with remnants of lesions in

5    his ribs, his hips, his spine, his jaw, which cause constant

6    pain.  That's remission.  He needs regular blood work and he

7    needs regular scanning of his body, scanning of his bones.  But

8    you can't scan too often because the radiation can kill him.

9    That's remission.

10:22 10        It means he has flare-ups of colitis and he's had

11    hepatitis, which are side effects of all the past treatments.

12    That's remission.  And when he got arrested in this case and he

13    spent two days in prison before he got bail, he was in prison

14    January 28 to January 30, before COVID.  He couldn't eat

15    anything in prison because of his severe colitis.  And after

16    two days in prison, he got an infection on his feet, which

17    underscores the fact that this man is more vulnerable than

18    almost any other federal prisoner, and certainly as much as any

19    other federal prisoner.  And by the way, there's a case out of

10:23 20    Pennsylvania called United States v. Saunders that finds his

21    condition to be an extraordinary and compelling condition that

22    could warrant release.

23         Now, the government mentioned -- so that's remission.

24    Getting an infection after being in jail for two days.  The

25    government says he's not on medication.  That's false.  He's on

1    three kinds of prescription medication.  What else does

2    remission mean?  Remission means he wears a mask everywhere.

3    He avoids public spaces.  He's susceptible because of his

4    destroyed immune system, not just to COVID, Judge, to staph

5    infections, to the flu, to all sorts of common bacterial and

6    viral infections, to fungi, to respiratory infections, to strep

7    throat, to tuberculosis.  And if he gets them, it's not like my

8    17-year-old nephew with lymphoma who gets them.  He can

9    recover.  Professor Lieber, if he gets those, it could be a

10:24 10   death sentence because his immune system is so compromised.

11        Let me speak again to the immunosuppression.  I would

12   go so far as to be willing to say that the possibility of

13   getting more cancer is not the primary argument I'm making

14   here.  There is not a question -- and I'll get into these

15   statistics in a minute -- there's not a question that he will

16   get cancer again.  The question is just how quickly and how

17   aggressively.  But the clear and present danger for Professor

18   Lieber, as we sit here today, is the compromised immune system.

19   His body is simply unable to fight the way other people's

10:25 20   bodies, even other lymphoma patients' bodies are able to fight.

21        The way he mitigates that, the way he protects against

22   that is by rarely, if ever, leaving his house and rarely, if

23   ever, having anybody come to his house.  This is true even

24   after COVID subsided.  His most recent cancer therapy, which is

25   called CAR T, like C-A-R and the letter T therapy, is a stem

cell therapy that he underwent in October of 2022.  After that,
for ten days, he basically lived in a bubble in a hospital
because he couldn't be near somebody who sneezed accidentally.
He couldn't be near a dirty toilet or somebody who doesn't know
that they're carrying the flu.  He lived in a bubble in the
hospital.  When he got home, he needed 24-hour-a-day caretaking
which was provided by his wife Jenny.  To take every measure to
avoid infection by way of virus or bacteria, to this day, they
clean and decontaminate surfaces.  They wipe down groceries.
Charlie hasn't been in a grocery store, let alone like a prison
infirmary, what that would do.  He takes every caution -- he
must take every caution.  His doctors want him to take every
caution to avoid not just COVID but all of the other viruses
and bacterias and airborne pathogens that are out there.

If he does get COVID, for somebody his age, 64, for
somebody with his history of aggressive, frankly, destructive
cancer therapies, he has a one in three chance of dying.  He
has a one in three chance of dying.  We got that from his
doctor quite recently.

Now, it's not only if he gets a virus -- COVID or any
other one -- that he's in much worse shape to fight it off, but
there's a serious question as to whether he could ever recover.
In prison, where you have to share soap with people and share
toilets and showers with people, in prison where you don't know
who's preparing your food and what their level of health

1   vigilance is, in prison, which is constructed to maximize

2   safety, not health, in prison he will be a sitting duck for

3   disease.  In prison he will not have access to medical care

4   that he may need on a day-to-day basis.  If his colitis flares

5   up, if he gets an infection like the one he got during only two

6   days waiting for bail, he may not be able to get to the front

7   of the line to see the doctor.  And if he sees the doctor, the

8   doctor is unlikely to be a specialist dealing with somebody in

9   Charlie's condition.  The wrong medication that throws off his

10:30 10  potassium levels could cause a heart attack.  We've spent a lot

11  of time studying what it means to be in remission.  It just is

12  not the sunshine and rainbows that the government paints it as.

13       Even with the best intentions of the prison and the

14  prisoner, the level of vigilance he needs to stay clean,

15  pristine and protected just can't be maintained in a prison.

16       I'll go back to the cancer for one moment.  Mr. Casey

17  talks about how studies that he got off the Internet show that

18  you can live for 20 years with this kind of lymphoma.  But that

19  statistic does not apply to somebody who got it later in life

10:31 20  and somebody who's had seven or eight rounds of aggressive

21  treatment.  Our understanding, and I think this comes directly

22  from the doctor, is that he hopes Charlie might make it for

23  five more years, hopes.

24       In our view, Judge, a downward departure from the

25  PSR's guidelines of 12 to 18 months, our guidelines view, which

1    is a little lower, whatever guidelines view you take, a

2    downward departure is absolutely warranted in this case.

3         I'd like to speak to two more factors, and then wind

4    up.  The government spoke a little bit about the message that a

5    non-incarceratory, a non-custodial sentence would send.  First

6    of all, very few people find themselves in the tragic and

7    unfortunate shoes that Professor Lieber is in.  Nonetheless,

8    the former United States Attorney in this building, in this

9    district, when talking about the kinds of cases like Professor

10:33 10   Lieber's, academic misconduct, or I should say misconduct in

11   the realm of academia, he said publicly after Professor

12   Lieber's trial, if the point was to scare the heck out of the

13   academic community, these cases -- the China initiative -- did

14   that.  The former U.S. Attorney who brought the case said this

15   has accomplished its public deterrent effect.

16        Professor Lieber's case, as we put in our paper, in

17   our sentencing submission, went worldwide on the Internet.  The

18   FBI is now working with universities in order to educate them

19   better on how their professors are supposed to react in

10:34 20   situations when there are questions about relationships,

21   conduct, conflicts of interest, foreign activity, private

22   business activity.  The academic community has changed because

23   of this case.  There is a woman, who's the head of the

24   Association of American Universities, who said that Professor

25   Lieber's case was the most helpful thing to convince our

1    faculty of the seriousness of threats posed by China and other

2    foreign countries.

3            As I understand it, Harvard and other universities

4    have clarified their procedures because of this case and FBI

5    agents are working -- some embedded in universities, as I

6    understand it -- because of the message this has sent

7    worldwide.

8            Anyone following this case -- and I submit to you

9    especially academics following this case -- have gotten the

10:35 10   message that you don't get a free ride when you get convicted

11    of crimes related in certain respects to your employment.

12           The Harvard academic community, the chemistry

13    community, the community around the United States that deals

14    with Professor Lieber's specific subject, nanoscience and

15    nanowires, they've all gotten the message.  They all see him

16    sitting here.  They all see him having lost his job.  They all

17    see him ruined.  Nobody thinks he got a free ride.

18           And just to speak to one other point that Mr. Casey

19    made about Dr. Lieber's pension and whether he's still getting

10:36 20   paid by Harvard, his pension is coming in.  He is getting it.

21    But it vested before this case, as I understand the dates.  He

22    spent 30 years at Harvard.  They could not revoke his pension.

23    It had already vested.  So it's not like he's getting a

24    windfall here.  He worked for and earned what he's getting

25    separate and apart from this case.

1          Now, Judge, I'm going to make, if you'll indulge me

2    again, just some final remarks.

3          The past ten years --

4          THE COURT:  I'm sorry?

5          MR. MUKASEY:  The past ten years of Professor Lieber's

6    life have been horrific medically speaking.  The past three

7    years have been unspeakably difficult.  He and his family have

8    been subject to the worst kind of antisemitic threats, the

9    worst threats of violence.  They were so bad that we actually

10:38 10  reported them to the FBI.

11         But notwithstanding the crimes that Mr. Casey

12   describes and the crimes that Professor Lieber acknowledges --

13   and you'll hear that in his statement -- notwithstanding, he

14   still has a legion of people who still believe in him, his

15   family, his extended family, his students and his peers.  And I

16   hope Your Honor -- and I hope the law clerks -- I hope

17   everybody read the letters that were written on behalf of

18   Charlie because they strike, in my opinion, terribly, terribly

19   important themes that have nothing to do with the guidelines or

10:39 20  Section 3553(a).  The letters strike themes about Charlie's

21   dedication, his service, his courage, his love, his compassion,

22   his empathy, his work ethic, his decency and his honesty.

23         These were not pervasive lies that went on for years.

24   It was outlier activity, aberrational activity in an otherwise

25   moral, humble and just life.

1          I want to just focus on one of the things that stuck

2     out to me about the letters.  Dozens of the letters spoke about

3     Charlie's work as a mentor to other students.  The same way

4     Your Honor mentors law clerks and I mentor young associates, he

5     mentored generations of young scientists.  But he did it way

6     better and it's proof positive that the characterization of

7     Charlie Lieber as entitled or self-interested or greedy is

8     nothing but a grotesque distortion of the truth.  Charlie

9     Lieber didn't seek to lift himself up through criminal

10:40 10     activity.  He sought to lift himself up by lifting other people

11    up.  He gave his students pushes in the right direction,

12    friendship, support, an ear to listen to.

13          Many of the letters talk about Charlie instilling

14    belief in his students that they didn't even have in

15    themselves.  His message to all of his mentees was the same:

16    Work hard, be honest and create a better future through science

17    for mankind.  He helped the students -- these are not my words.

18    I'm paraphrasing the students -- he helped them see a world,

19    based on his science and what he wanted them to do, with less

10:41 20    disease and more healing and he was well on his way to breaking

21    ground in those areas.

22          Here are some quotes from people that Charlie

23    mentored:  "Charlie gave me purpose.  Charlie inspired me to

24    reach higher.  He's a person who goes the extra mile to do what

25    he can to help others.  He represents the very best in academic

1    mentorship.  At the peak of the pandemic, Charlie was battling

2    cancer and preparing for his case.  Still, whenever I needed

3    help, Charlie always unconditionally supported me.  I hope to

4    leave you with some flavor of Charlie as a person and of the

5    profound personal impact his mentorship has had on students'

6    lives to try to guide us."  This is my favorite one.  One

7    student writes "A thesis advisor is the academic parent for the

8    student.  A great academic parent supports, guides and inspires

9    students to continue their own pursuit advancing science for a

10:43 10    great cause.  An exceptional academic parent changes lives of

11    students.  That's exactly what Charlie did for me.  Charlie

12    taught me to believe in myself.  For that lesson, I will be

13    forever grateful."

14          Your Honor, these letters that are the most

15    extraordinary I've ever seen in a sentencing proceeding, they

16    describe a man, Charlie Lieber, with a heart that is full of

17    grace, not greed, with a soul that is driven by curiosity, not

18    corruption, and a spirit that's defined by service to others,

19    service to science and service to the human condition.  That's

10:44 20    Charlie Lieber.  This case is an outlier.  It's an aberration

21    to a life that is otherwise defined by integrity and mortality.

22    And the letters tell the court, and I hope some of what I'm

23    telling the court is that it can believe -- Your Honor can

24    believe in Charlie, in his accountability, in his acceptance of

25    responsibility and his potential for growth and contribution to

society in the future.  He's been living under an impossibly
punishing set of circumstances, professional ruination,
financial pain, indescribable physical ailments and possibly
death.  He's playing defense every day of his life to avoid
getting sicker than he already is.

He has not led a spotless life, Judge.  But I would
suggest that good character does not mean you've led a spotless
life.  It's desire to make amends and to learn from your
mistakes and not to repeat them, that's good character.

This man has given so many students, so many
scientists, so many people suffering from disease a chance to
thrive that he deserves a second chance without being put into
the jeopardy and the danger and the threat that prison would
pose for him.

I also want to suggest that, based on some of my
research, if he were sentenced to prison, it is possible that
he would be housed in a state facility because it would be a
relatively short sentence compared to many other federal
sentences.  I think a day is a long federal sentence.  But
consider what would happen if he's put in a state facility for
the short term where all the dangers I've described about
prison would be multiplied exponentially because we know the
conditions in state prison.  That's a risk that is too great.

He already lives in a physical, financial, medical,
reputational prison.  But at least he can control his health

1    there in his house.  Please don't put him in a prison where he

2    won't be able to control his health.

3         I submit, Judge, that any period of incarceration is

4    not necessary here to achieve the purposes of sentencing and

5    that a sentence of probation is what's appropriate.  Thank you.

6         THE COURT:  Any rebuttal?

7         MR. CASEY:  Just very briefly, Your Honor.

8         With respect to the defendant's health, with all due

9    respect to Mr. Mukasey's comments and his advocacy on behalf of

10:48 10    his client, the government is taking its lead from this

11    two-page letter that the defendant's doctor submitted that's

12    attached as Exhibit A to his sentencing memorandum.

13         THE COURT:  Which letter is this?

14         MR. CASEY:  The letter dated January 20, 2023 from

15    Dr. Lieber's doctor.

16         THE COURT:  From his doctor?

17         MR. CASEY:  Correct.  Describing his health and his

18    condition as of --

19         THE COURT:  Isn't that part of the record already?  It

10:48 20    seems to me I have seen such a letter.

21         MR. CASEY:  You have seen it.  It's attached as

22    Exhibit A to the memorandum.  That's where the government is

23    taking its lead from and its position from.

24         THE COURT:  I've seen it.  It's somewhere here with

25    me.

1    MR. CASEY:  All I'm suggesting, Your Honor, is that

2    review the letter carefully.  The government's position in this

3    case is largely informed by this letter and we would suggest

4    that Your Honor's decision be guided by that letter in large

5    part as well.

6        Regarding the issue of deterrence, with all due

7    respect to Mr. Mukasey, I think he's missing the point

8    entirely.  This case has nothing to do with scaring academics.

9    The point of this case is whether you're a prominent professor

10:49 10    at Harvard or you're a janitor at Harvard, if you lie and you

11    cheat on your taxes and you obstruct a government inquiry, a

12    legitimate government inquiry, you will be held accountable for

13    it.  It has nothing to do with scaring professors or trying to

14    deter them from doing the things that they ordinarily do.

15    That's not what this case is about, and any suggestion

16    otherwise is just not accurate.  It ignores the facts.  It

17    ignores the charges.

18        Lastly, Your Honor, you know, the government is not

19    claiming that the defendant is a villain.  I'm not sure how we

10:50 20    could claim he's a villain.  He's done many great things in his

21    life.  That's undisputed.  I mean, the number of letters that

22    have been received on his behalf in this proceeding is truly

23    extraordinary.  The defendant has done many great things.  But

24    the evidence in this case speaks for itself.  His emails, Your

25    Honor, speak for themselves.  The number of times in those

emails that he is chastising people at Wuhan University for not

holding up their end of the bargain, for not getting him

nominated for a Nobel Prize, speak for themselves.  The

defendant's own words speak for themselves.  He admitted he did

this because he wanted to be recognized for what he's done.  He

wanted to win a Nobel Prize.  We're not making it up.

THE COURT:  I don't think we want to get into a new

argument by the government.

MR. CASEY:  I'm not making a new argument, Your Honor.

I'm simply pushing back against this notion that we're making

this whole thing up about him being greedy.  His emails and his

own statements to the FBI speaks for themselves.

The last thing I'll say, Your Honor, is I think the

defense is giving absolutely lip service to the fact that

Dr. Lieber has accepted responsibility or he's remorseful for

his conduct.  I think Mr. Mukasey spoke for about 20 seconds

about the conduct in the case, which consists of chronic lies

over a period of years.

And I think the defendant's sentencing memorandum does

the same.  It hardly mentions the conduct.  Curiously it

contains this line, "Professor Lieber is profoundly remorseful

for the facts and circumstances that have brought him before

the court."  The facts and circumstances.  I think that says

all we need to know about whether Dr. Lieber is truly

remorseful for the conduct in the case.

1          And so for all of those reasons, Your Honor, we think

2    the government's sentencing recommendation is eminently

3    reasonable and absolutely necessary to not only punish the

4    defendant but to provide general deterrence, which I've talked

5    about.

6          THE COURT:  Mr. Lieber, do you wish to say anything?

7    You are more than entitled to --

8          THE DEFENDANT:  Yes, Judge.  I would like to.

9          THE COURT:  Would you mind taking off your mask,

10:52 10   please.

11         MR. MUKASEY:  He really can't.

12         THE DEFENDANT:  I really don't --

13         THE COURT:  He needs to do it.

14         MR. MUKASEY:  He can't take it off.

15         THE DEFENDANT:  I've always worn a mask because --

16         THE COURT:  Then shout because otherwise it's

17   difficult to understand and hear you.

18         THE DEFENDANT:  I will try to speak slowly and

19   clearly, loudly.

10:52 20         Okay.  Dear Judge Zobel, I would like to express my

21   sincere apologies and remorse for my actions.  First, I am

22   extremely sorry for dragging my family through this ordeal the

23   past several years.  My wife, Jenny, who's been mentioned, and

24   my two children, Alex and Kevin, have suffered greatly as a

25   result of my actions, and it is difficult to express how much

1    their steadfast support each and every day and more so from

2    Jenny and regular phone calls from my children have helped me

3    to keep going.  I'm sorry for what you have had to go through

4    because of me.

5        I'm also sorry for subjecting my older brother, Lee,

6    and my uncle Mark and his family to this painful experience and

7    thank them as well for their continued support when it might

8    have been much easier to stay silent.

9        Last but not least, it's really important for me to

10:53 10  say how sorry I am or was -- am -- for placing my mother,

11   Marlene, during the last months of her life under this burden

12   from me.  My mother and I were always closed.  We shared a lot

13   of interests, from gardening to intellectual discussion.  Even

14   if we -- people who know us, we argued a lot as strong-willed

15   mothers and sons do, and to this day it brings me -- this is

16   really from my heart -- great sadness and tears often that I

17   couldn't be with her, as I should have, at the end as a result

18   of my actions.  Your memory is still very strong and dear to

19   me, Mom.  I will forever love you.

10:54 20      It also is said by Mr. Mukasey that I'd like to

21   express my sincere apologies for the troubles I've caused for

22   my friends, few friends, as well as my many doctoral and

23   post-doctoral students who trained with me over the past 30

24   plus years.  You've always been like kids to me that I've tried

25   to do the best to support in your careers and your lives and I

1    feel I failed you with the problems associated with my actions.

2    Under these very difficult times, I really appreciate all the

3    support that you've given to me.  I know that what you've been

4    able to give back -- what I've been able to give back the last

5    three years is not as much as I would have liked but your

6    support and love, along with that of my family, have helped me

7    to keep going and think about the future.

8           The last three plus years have been a truly horrific

9    experience for me and my wife and my children, and I regret the

10:56 10   things that brought me here.  As you have heard, I've lost my

11   job, my career and my freedom, and I sincerely hope that I'm

12   also not going to lose what remains of my life given my poor

13   health.

14          I've always been very focused on my research trying to

15   advance science for the better of all, and also equally helping

16   young researchers training with me.  In retrospect, my focus --

17   and this is really what is, was the problem -- on advancing

18   science and helping people led me to ignore other things that I

19   now know were very important.

10:56 20          I accept responsibility for not knowing about foreign

21   tax issues that I really should have been aware of.  In

22   addition, I regret I did not provide a more complete account

23   regarding my association with Dr. Mai at Wuhan, which was many

24   years before when I was asked.  These are all mistakes that I

25   have made and I accept responsibility for and promise not to

1    make again.

2          I can say this with complete -- you know, hundred

3    percent confidence that what I've learned from this experience,

4    horrific as it is, that I will never be before this court or

5    another court again.

6          Finally, I would like to reiterate how remorseful I

7    am.  I owe my family, my former students and postdoctorals and

8    my friends for sticking by me, and it breaks my heart for the

9    ones -- Mike, Dima and others -- no longer with us and whom I

10:57 10    could not thank properly because of my actions.  I hope that in

11    the future -- and this is whatever transpires -- that I am,

12    again, able with whatever life I have left to help young

13    scientists learn to be successful, encourage and support them

14    in their careers and contribute to science that benefits

15    humanity.

16          Thank you very much for listening to what I had to say

17    today.

18          THE COURT:  You're welcome.

19          Do you wish -- I don't know who you are, but do you

10:58 20    wish to speak?  The other person at counsel table.

21          MR. MUKASEY:  That's all from us, Judge.

22          THE COURT:  So that's it?

23          MR. MUKASEY:  That's it.

24          THE COURT:  All right.

25          Well, I thank you all for your fulsome speeches.  They

1    are always helpful.  You know, you each come with different

2    perspectives, obviously, and perspectives that I cannot have

3    other than through you.  And I appreciate that.  It doesn't

4    make sentencing any easier.  But sometimes it elaborates what

5    I'm thinking about.

6             In any event, this was a very serious offense.

7    There's no question about that.  And everybody now acknowledges

8    it.  And --

9             Well, let me just get to the guts of it.  I sentence

10:59 10   you to a term of imprisonment of one day, which you've already

11   served.  You shall, however, also serve a period of supervised

12   release for two years.  And the first six months of that shall

13   be in home confinement.  That is, you can't leave your house

14   except to go to the doctor and things of that sort and

15   probation will work out with you the details of how that will

16   go.

17            You shall pay a fine of $50,000 in addition to the

18   amount that has been repaid, the $33,000, or whatever.  And

19   that shall be done as soon as possible.

11:00 20            There is a special assessment of $600, which is

21   required by statute, and you will need to pay that as well.

22            I think the amount that you previously paid, according

23   to my notes, is $33,600 to IRS.  Clearly you are not going to

24   have to pay that again.  So that's the -- that's the judgment

25   of this court -- the sentence of this court that will be

```
 1  contained in the judgment.

 2          I should also point out to you that you have a right

 3  to appeal from that judgment and I would ask Mr. Mukasey to

 4  file any notice of appeal if you decide to go forward with an

 5  appeal.  I think that's all I have.  Right?

 6          PROBATION:  Your Honor, my apologies.  Just to

 7  clarify, that time serve would constitute two days of

 8  imprisonment.  And the six months of home confinement would be

 9  subject to location monitoring or other monitoring --

11:01 10         THE COURT:  Right.

11         PROBATION:  -- as detailed by the Probation Office.

12         THE COURT:  I don't think we need the additional

13  monitoring --

14         THE CLERK:  The electronic -

15         THE COURT:  -- bracelet.

16         PROBATION:  Correct.  Thank you.

17         THE COURT:  So the home confinement does not have a

18  bracelet and the sentencing is, as probation points out, more

19  complicated than I made it.  And that's it.  Yes.

11:01 20         MR. CASEY:  If I could just raise one technical point.

21  Just to be clear, the court is ordering the $33,600 in

22  restitution.  I know it's already been paid, but in order --

23         THE COURT:  The restitution, as I understand it, of

24  $33,600 has already been paid.

25         MR. CASEY:  It's been paid but it remains at the
```

1    clerk's office, so in order for it actually to go where it

2    needs to go, the court needs to order --

3              THE COURT:  So it needs to be part of the judgment?

4              MR. CASEY:  That's correct.

5              THE COURT:  And the $50,000 is also part of the

6    judgment.  And I don't -- I'm not exactly sure how defendant

7    wants to pay that, whether in installments or all at once.  If

8    there are to be installments, then you should note that in the

9    judgment as well.

11:01 10             MR. MUKASEY:  We will discuss it with the client and

11   get ahold of probation and let them know, if that's okay.

12             THE COURT:  Well, you need to let me know because I

13   have to sign a judgment before we're all done with all of this.

14   So you don't have to do it right now but try to tell me before

15   the end of the week.  We don't have a judgment until we do

16   this.

17             MR. MUKASEY:  Okay.  We'll make one lump sum payment.

18             THE COURT:  A lump sum payment.  Okay.  So whatever I

19   said previously about paying over time is no longer.  It is to

11:02 20   be paid forthwith, which is --

21             PROBATION:  Typically within 30 days of judgment.

22             THE COURT:  Okay.  Anything else?

23             MR. MUKASEY:  Not from the defendant.

24             THE COURT:  Well, I thank you all.

25             Yes.

1          MR. CASEY:  No.  Just thank you, Your Honor.

2          THE COURT:  The defendant shall now report to his

3   probation officer.  I would ask you to take care of that before

4   you leave here today, and I think that's all I have to do.

5          MR. MUKASEY:  Thank you, Your Honor.

6          THE COURT:  Well, thank you for making it a little

7   easier than it might have been.

8          Court is in recess.

9   (Proceedings adjourned at 11:03 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8              I certify that the foregoing is a correct transcript

9    from the record of proceedings taken April 26, 2023 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                     5/4/23

16

17   Kathleen Mullen Silva, RPR, CRR                Date
     Official Court Reporter
18

19

20

21

22

23

24

25